May it please the court, Paul Hoffman, appearing for the plaintiff Nolan Lewis. I'd like to go directly to address the three questions that the court has raised. The first one had to do with whether the district court abused its discretion by not granting us leave to amend our negligence claim. And procedurally what happened is we filed the original complaint asserting Bivens' actions against the individual defendants. And the amended complaint was only to add the United States and adding the negligence claim in the first instance. And so, and we incorporated by reference the facts in the complaint and stated in the negligence cause of action that we had additional negligence claims. We were not given an opportunity to amend. We could have added additional facts we think that would have bolstered the foreseeability. Well that begs the question, so what additional facts would you have added had you been given leave to amend? I think there were, for one thing there were additional facts regarding the flag. Now we, our position is that the court engaged in an erroneous foreseeability analysis, so that's separate, but we could have laid out reasons why the flag and the policies relating to the flag should have created, would have led anybody to understand that if there's a false flag in the system that it could create exactly the kind of harm that happened here. But in addition to that we could have disaggregated the negligence claims because there were negligence claims apart from the flag that could have been pled separately had we been given the opportunity to do it. But you filed the first amended complaint? Yes. You responded to a motion to dismiss? Right. And you filed a second amended complaint? No, no, no, no, no. Procedurally what happened is there was a complaint that did not allege negligence because it was a Bivens claim. Before anything happened in the case we filed a first amendment complaint that alleged the Federal Tort Claims Act claims against the United States which included the negligence claim. The motion to dismiss, the only motion to dismiss that was heard was about the first amended complaint. We were denied any ability to amend any time for the negligence claim. Okay, so I have the dockets in front of me. So the first amended complaint is in the district court. It is, the docket numbers are obscured, but it's at ER 381 and it does include a negligence claim and it's your cause of action number 9. Then there is your response to a motion to dismiss, which is the district court's docket 63, and you argue with respect to the notion of whether there's causation with respect to the flag and the alleged falsehood. Right. We addressed their arguments about it. And then that response at the very last page, page 24, you make a generalized request to amend if the court doesn't find your allegations sufficient. And then you file the second amended complaint, which is dated later. The other one is February 2017. That's your response. And March 2017 is your second amended complaint, which still has your ninth cause of action for negligence, but it appears to be exactly the same. There are no additional allegations. I also didn't find any motion seeking leave to amend with an explanation of what additional facts you were going to allege to support the negligence claim based on the flag or any other negligence claim. Well, Your Honor, the negligence claim in the motion to dismiss order was denied without leave to amend. We were told that we didn't have ability to amend. So there was no oral argument about this. We got the order. The order said we can't amend our negligence claim, so we didn't. Your response to the motion to dismiss, as far as I can tell, did not contain any argument about additional facts, and so the district court would not have been considering that and ruling on that motion. So when you received the order, you didn't consider filing any sort of motion seeking leave, motion for reconsider, anything that would lay out the additional facts so the district court could know, because you at this point have never told the district court what additional facts you're going to allege. As far as I can tell, you never told the district court that at any point in the record. Well, Your Honor, there certainly were additional facts when we got into discovery, but we didn't, you're correct, we didn't make that motion. And you did not bring that to the district court's attention? The additional facts? We didn't bring it to the court's attention after the court said it was denied without leave to amend. No, we did not. We assumed that the court had intended that we were not allowed to amend, so we didn't. So none of these rulings were done with the benefit of oral argument, right? No, there was no oral argument on any of the motions, not the summary judgment motion, not the motion to dismiss. We were told not to. I mean, the court was very clear about what we could amend and what we couldn't amend, and we were not permitted to amend, so we didn't. What about the intentional infliction claim? On the intentional infliction claim, the question the court asked is whether in the law enforcement context you could have an intentional infliction claim without an allegation of excessive force. And the first point, I guess, as far as we can tell — Just more generally. One problem with asking these questions is that sometimes we over-direct things. Oh, okay. So I'd like to hear about the ineffective assistance claim generally. Well, okay. The claim, from our standpoint, is based on what we think is the extreme and outrageous behavior of these officers with respect to a decorated, 100 percent disabled Vietnam War vet. They knew that he had PTSD. Well, first of all, Mossbrooks claims he didn't know, but in fact, the report that he was relying on from Ms. Daya is that he said so to her. Right. And Defendant Joy, who was the lead detective of the two of them, where they talked to each other and they came to the — they did everything together, he acknowledges that he was told that he had PTSD, and he didn't doubt it. And it would be pretty easy to figure it out. I mean, it's in their records, right? The VA knows that he's 100 percent disabled because of war-related PTSD. If we were to assume he was disabled and that there were — that the officers knew about his disability and that there were reasonable accommodations available, what supports your argument that there was extreme and outrageous conduct? Well, the first one is that coming into a 100 percent disabled Vietnam War's home and behaving the way they did and calling him a baby killer, the things that people called him when he came back from his service to this country, is pretty — I mean, I think any jury would find that extreme and outrageous. In addition to that, they lunged at him. They called him a pill head. They questioned his sexual orientation. They treated him in the way that — According to him, they said they were going to go take him outside and beat him up. Right. They threatened him with physical injury. They threatened him with an abusive process. They threatened — they said they had the DA in their pocket and that he'd be — they'd do this. They took him to a faraway jail without medication twice, not just the first time. The second time they did it, so they waited until right before — I would say the faraway jail is the least impressive part, but without medication. But the thing is, they could have processed him at where he was. They could have made sure he had his meds, for example. Well, so — I mean, that's — We're relying on — we're viewing the facts in the light most favorable to your client. Of course. And his testimony and his declaration is that they wouldn't let me take my medications with me and didn't — interfered with me being able to take my medications when I was at a hospital. And so he argues that — or you argue that that shows the intentional infliction of emotional distress. Well, that's part of it. I mean, in other words, they could have easily provided for him to get his P.T.S. But there's more to it. So that's his argument, which we're accepting his statement of the facts. But when you're considering qualitatively how to — what is that — with that behavior, I think we also have to consider other evidence, which is that the officer's testimony that he would not have been allowed to take medications into a facility, that they took a written list of medications with him so that he could obtain medications. And leaving all of that in its totality doesn't seem to be egregious, extreme conduct. The argument is that that's actually true, that he couldn't have brought it in. I mean, that's what the officer's statement is. Right, but that's what we have. So that's a disputed fact, right? We have their testimony, but it's not — but with that disputed fact, he has no basis to say whether that's true or not. He's just speculating. He has no foundation to say that's not true. Well, but listen, they know he's 100 percent disabled, that he goes to the VA for his meds. That's not the issue, though. So how does he have any basis other than speculation to say that he would have been allowed to take medications into a detention center? They have to take it to the jail. They could have taken him to the VA and given him his meds. That's where he gets them. But that's not your argument. Your argument is that they were extreme and outrageous because they didn't allow him to take his medications with him when they arrested him. No, our argument is that they — I mean, it's part of our argument, but part of the argument is that they orchestrated this so that he was put in detention twice without his meds when they could easily have accommodated him. Certainly on the rehab act claim, they know he's got PTSD. Certainly by the second time they know he has PTSD. Why don't they take him to the VA and make sure he gets his meds so he doesn't undergo the extreme emotional distress of being in a jail for that period of time without his meds? Why not? I thought that he was, in fact, in the hospital, and he asked for the meds in the hospital. Or was it in the hospital, the VA clinic? Right. Right? And then they said, oh, you can't have the meds even from — even at that point when he was — I mean, I don't know what — the question is could they have arranged for — at least on the rehab act. But this is only a piece of it anyway, right? Right. I mean, it's a course of conduct. I mean, the question for intentional inflicts emotional distress, right, and part of the question you guys asked was can you have an intentional function of emotional distress by officers without excessive force? The restatement, 1965, one of its examples, number 19, is a case where the detective arrests a suspect, tells the suspect in order to get them to confess that their child is dying in a hospital unless they confess they won't be allowed to go to the hospital. That's found to be an example of intentional infliction of emotional distress. Absolutely no excessive force claim. I think viewing TECLA, although there is some excessive force in TECLA, the court doesn't talk about the fact that you need excessive force. And it's clear that in TECLA throwing some shoes at an 11-year-old boy and spitting on them, making derogatory comments about his home country, Ethiopia, in the context of their arrest of his father is intentional infliction of emotional distress, or at least it gets you past summary judgment for intentional infliction of emotional distress. Which is really the issue. There's a course of conduct here where they treat him as badly as you could treat somebody. Didn't they also pull a gun on him? Excuse me? Didn't they also pull a gun on him? In TECLA. Yes, in TECLA they did. In TECLA they did pull a gun on him. They didn't here, right? Well, when they arrested him the day after they had guns and they said they would shoot him if he didn't open the door immediately, he said, I'm getting my pants on. And then they come in and they throw him down to the ground, where they do, in fact, from our standpoint, engage in excessive force and for completely unnecessary reason, knowing that the guy has these kinds of problems. And I think the point is that there's enough in the record for a trier of fact to decide if this is extreme and outrageous. I mean, there's a whole series of conduct and what they hurl at him that, and part of the intentional infliction analysis is the vulnerability of the victim. You've got somebody that they know is vulnerable and is vulnerable. You have an abuse of authority from an authority figure, like the VA police, and you have extreme forms of injury, which here he describes, and which actually went on ongoing. And I think that the two claims, the intentional inflictional claim, in a way, overlaps factually with the deliberate indifference under the rehab act claim, right? Because the same facts, and I think part of the question was, was there deliberate indifference by these defendants at any point in time? And I think our position is that these facts show that instead of accommodating him, instead of affirmatively making sure that whatever they were doing from their law enforcement standpoint did not cause him additional emotional distress because of his known disability, that they did the opposite of it. I mean, the whole Sheehan thesis or, you know, approach is very kind of, it's very difficult to apply in the context of an arrest, right? Because arrests do make people very unhappy and do create a lot of stress, no matter who you are. And so there has to be some line between what you can legitimately do in general and how you have to do it differently if you know that somebody has PTSD. That's really the problem, right? I agree with that. I mean, there's no question that there can be a difficult line. I think the reason why we say this isn't difficult, or at least for summary judgment purposes shouldn't be viewed that way, is that you don't have to call somebody a baby killer in the context of your law enforcement duties. You don't have to. We're going to be told, because we were told in the briefs, that essentially they tried to ask him directly. They were convinced he was lying, and they had to go to some higher level of interrogation technique. I mean, it includes the question of whether you could have called him a baby killer even if he didn't have PTSD. But their assumption is somehow that you could, that they could go to aggressive interrogation techniques because he was lying. But I think that that raises a triable issue. I don't think as a matter of law these techniques are appropriate and not intentional infliction of emotional stress. I know, but I'm asking in the Rehabilitation Act context. Oh, in the Rehabilitation Act context. Well, I think that, I mean, Sheehan doesn't say exactly the reasonableness, and Voss doesn't either. Voss says it applies. And I think that given these facts, I think there's a triable issue about whether there was reasonable accommodation that could be given. And I think we would have, there would be experts on both sides, presumably about the law enforcement techniques to say either that these are for any normal law enforcement, which I think we would be able to find in this context in particular. In particular, given VA officers who are trained about PTSD, they're trained about how to deal with this and how not to exacerbate their distress. And that there are other techniques that one could use to deal with the law enforcement imperatives. For the other thing is that they want him to confess, but from their testimony, as soon as Diaz said that he said those words, that was it from their standpoint, right? They consistently said that's all they needed. They trusted her. They weren't going to do any additional investigation. He was going to be charged. All right. Mossbrooks said that. Joyce said he wanted to get the ear. There's a difference between Mossbrooks and Joy. Counsel, you're over your time. Sorry. The government has to say. Thank you, Your Honors. Good morning. May it please the Court. Assistant United States Attorney Jessica Chey on behalf of the Kellys. This case arises from an incident in April 2014 when a VA pharmacist reported to her supervisor that an irate patient. Don't you think our questioning suggests that we know all this? I apologize. Does our questioning suggest that we know something about this case? Yes, Your Honor. And I'll get to that point. We know the facts of the case. Yes, Your Honor. Just to focus on the issues that are highlighted for the Court. For the purposes of the Rehab Act claim, as a threshold matter, there's nothing in the record to suggest that Mr. Lewis either requested an accommodation for his disability or that the need for any such accommodation was otherwise obvious under the circumstances. Second, although at least some of the conduct alleged by Mr. Lewis is unquestionably offensive, it was not so extreme and outrageous as to rise to the level of conduct that exceeds all bounds of that which would be tolerated in the civilized community. So, suppose, so your argument has to be that, taking as true that Officer, in the first, in the voluntary interview, taking as true that Officer Mossbrooks insulted Lewis, called him a baby killer, lunged at him, threatened to kidnap and beat him while Lewis was voluntarily being interviewed, that that is not extreme and outrageous as a matter of law. That it doesn't have to go to a jury to decide that, as a matter of law, this district court judge sitting in his chambers with no oral argument could just decide, as a matter of law, that that conduct was not extreme and outrageous. Your Honor, it is our position that taking the facts in the light most favorable to Mr. Lewis, that that conduct was not sufficiently extreme and outrageous. Okay. And what case do you rely on for that? The cases in which, in the arrest. Which case? Which case is this particular conduct, as a matter of law, not extreme and outrageous? The Techley case, Your Honor, would be one of them. The Techley case, cases alleging intentional infliction of emotional distress in the context of an arrest have often involved displays or uses of force. But they don't state what the alternative, that that's the only situation in which you can have intentional infliction of emotional distress, do they? No, they don't, Your Honor. But absent aggravating circumstances, absent a known sensitivity, there. . . But there was a known sensitivity. To that question, Your Honor, the fact that the officers knew he had PTSD, that's all they knew. The entire universe of what they knew about his PTSD was that he said that he had it. They also knew he was a Vietnam veteran. Yes, they did, Your Honor. Because otherwise they wouldn't have been able to call him a baby killer. But, Your Honor, in the context of what they knew, that information was communicated to them in the context of the words of the threat that Ms. Dia reported to her supervisor. That Mr. Lewis said to her, I have PTSD and anger issues. This is what makes me mad. I'm going to go shoot Dr. Munger and everyone else. He never agreed he said that. And as I understand it, that's the genesis of this whole thing. Correct. And that, to me, whether or not he said that, also seems to be a question of fact for the jury. Well, it is. . . It's not recorded, right? It is not recorded, Your Honor.  But it is undisputed that that is what was reported to the officers. And the officers also recorded in their report of investigation that they submitted to the DA's office Mr. Lewis's side of the story, where he said, I may have said that I wanted to slap someone. I'm sorry for threatening the pharmacist supervisor. I don't mean to hurt anybody. All of those comments were summarized in the report of investigation along with Ms. Dia's statement. So it is undisputed that that's what was reported to Ms. Dia's supervisor. Let me ask you something. In any interrogation, whether he had PTSD or not, is telling somebody that you're going to take them outside and kidnap them and beat them up, is that appropriate? We are not. . . Well, you did say in your briefs, and I found it quite disturbing, actually. You said that this was legitimate, that they had to change the interrogation techniques and you suggested that this was fine, absent the PTSD. But it's not fine, even absent PTSD. We're not taking the position that the conduct alleged by Mr. Lewis was appropriate. It was unquestionably offensive. But the question is. . . Illegal. Does it rise. . . I mean, it would make the confession invalid if, in fact, it happened. If it was, in fact. . . If you take the position that it put him under such duress that it coerced a confession, then perhaps. But. . . He didn't confess, so. . . He did not confess. But whatever he said. . . But the question is whether or not this kind of. . . Well, you should go back to your briefs and see whether you didn't say it was fine, because I'm ready to say. . . We did say in our briefs that the officers had to engage in more aggressive. . . Right. The officers dispute many of what the comments. . . I understand that. I understand that. So. . . But the briefs suggested that what went on was. . . The briefs. . . Absent his PTSD would have been legitimate law enforcement activity. And I apologize if there's any confusion, Your Honor, as to our briefs, but aggressive, confrontational, adversarial interrogation techniques are used routinely. And for purposes of the Rehab Act claim, there was no indication that either of the officers knew that any accommodation was necessary. There's nothing in the record that suggests that Mr. Lewis has asked them for an accommodation for his PTSD. And Mr. Lewis is absolutely correct that he was not required to sign the Rehab Act in making that request. Right. But the situation had to be, in the absence of a request for an accommodation, the situation had to be so obvious that an accommodation was clearly necessary, as was the case in Sheehan, as was the case in Voss, both of which involved individuals who were clearly mentally disabled. Mr. Lewis, by his own account, was calm and collected throughout the interview. So there is nothing that the record reflects other than him asking the officers at one point to stop it. That is not an uncommon result from an investigational interview such as this one. And lastly, just as to the negligence claim, Your Honor, I agree with you completely that the record does not reflect that Mr. Lewis ever filed a motion for leave to amend his complaint. Whether or not it was an abuse of discretion for the district court to deny leave to amend based on the generic request for amendment, should the court be inclined to grant any part of the motion to dismiss, is a separate issue. The district court could not have been on notice based on Mr. Lewis's first amendment. Is there a case law that, absent futility or some other good cause, there should always be leave to amend whether requested or not? Isn't that our case law? I believe the case law, the Allen versus the City of Beverly Hills case, I believe it's a 1990 case, Your Honor, said that in the absence of new facts, particularly where, as here, the party has already amended their complaint once, that it is not an abuse of discretion, even if amendment would not be futile, for the district court to deny that where the party has not presented new facts and has offered no reasonable explanation for why those contentions were not developed in the first instance. None of these are new facts that Mr. Lewis is seeking to introduce. He is simply seeking to add new claims of negligence based on facts that were known to him from the outset. And unless the court would like me to go into some of the other claims, I can just... Well, I'd like you to go into the intentional infliction of a motion. Intentional infliction of emotional distress. That claim, again, Your Honor, I think that even assuming Mr. Lewis's version of the events is true, it is not so extreme and outrageous. The standard that this court has required is that it must be conduct that literally shocks the conscious, and that is simply not what happened here, especially in the context of an inherently adversarial confrontational interview process. Well, wait a second. The first one was supposed to be not confrontation. It was a voluntary interview, right? It was a voluntary interview. It ended up turning into an arrest, right? No, not that day, Your Honor. The officers left that day. So that was the first one, and then they came back, but they arrested him based on that first interview, right? They arrested him based on all the information they had up until that point, pursuant to a warrant. Okay. So the first interview where he contends that they made all these statements and threats, you're saying that's not extreme and outrageous as a matter of law? No. I don't think that that behavior rises to the level of extreme and outrageous conduct. Even in the context of a voluntary interview? Even in that context, Your Honor. The cases that this court and California courts have considered and have found a question as to whether or not certain conduct was extreme and outrageous are very different than what happened here. Name-calling, threats, it is simply not sufficient, absent some aggravating circumstance, and there was none here. So essentially the gravamen of this complaint is whether a pharmacist's report to her supervisor warranted an investigation and arrest and prosecution, and the answer to that question is yes. And just unless the court has any other questions as to any of the other claims, I will just refer to the Superior Court judge who acknowledged the lawfulness of his investigation even as he dismissed Mr. Lewis's first criminal complaint. And he said the Veterans Administration did right in calling the Veterans Police, did right to be concerned, and they did right to begin an investigation and take other actions. Yes, but he didn't say they were right the way they did it. Correct, Your Honor. That's a very weak link. A very weak link. To address the other faults. It isn't even clear that he knew anything about how they did it. I'm sorry, Your Honor? There's no reason to think he knew anything about what they did. No. To these specific claims that the court has highlighted, but there are also false arrest claims. There are malicious prosecution claims. There are abusive process claims that challenge the validity of the investigation and arrest and prosecution as a matter of law. So this case is very large. There are a number of claims at issue. Actually, I know that malicious prosecution is difficult, and you claim there was no favorable resolution. Correct, Your Honor. I don't gather. In fact, they dropped the charges, right? They dropped the charges provided that Mr. Lewis agreed to stay crime-free for a six-month period and continue his counseling. And that was cited as an agreement that the people made with Mr. Lewis that was accepted. So we don't believe that that would constitute a favorable termination in that the charges were dismissed without any action by Mr. Lewis. He had to take some action in that he had to maintain a clear record for six months and continue with his counseling. The second time they arrested him, the charges were dismissed originally, right?  And Ms. Day was emphatic, and I mean emphatic means she repeated many times at that preliminary hearing that what he said was, I want to shoot someone rather than I'm going to, right? And she was quite clear about that. She was asked repeatedly. And so the trial judge said, well, that's not enough to be an actual threat. And then they said, I'm going to get you. And then they went and they got another arrest warrant. Is that what they did? The decision was made to recharge the case. And to get a second arrest warrant. And to get a second arrest warrant. And to put in the second arrest warrant the same statement that they had originally relied on, even though she had said at the preliminary hearing that he said something else. Your Honor, she was not allowed to read the contemporaneous note and recording that she made within mere hours of the event happening. What do you mean she was not allowed to? She did not. She was not given the opportunity, I should say. She did not ask, to be fair, but she was not given the opportunity to review the report of contact that she wrote. I believe it was four hours after that telephone conversation. Nor was she allowed to read the email that she sent to her supervisors that day. So the fact that she. Wait a second. Who was representing her? Who was representing. What do you mean she wasn't allowed? She did not ask, Your Honor, but she did not have that document. So she did not refresh her recollection. So essentially she just misremembered what she initially put in her report of contact. Even though she was very, very specific that he didn't say X, he did say Y. Yes, Your Honor. It was not in the context of whether he said he went to slap somebody as opposed to shoot somebody. No. Her response was clear that it was shoot, not slap. Yes. She was absolutely unequivocal that he said that he was going to shoot somebody. The discrepancy was I want to go shoot Dr. Merchant versus I am going to go shoot Dr. Merchant. And the prosecutor who ultimately took on the second criminal case said it didn't matter to him that both of those statements would constitute a criminal threat. So had her testimony at that preliminary hearing been. . . Well, the prosecutor may have thought so, but you had a Supreme Court judge who said it was critical. And then they went ahead and they continued on. I mean, that should be maybe some evidence of false arrest. They'd already had a judicial ruling that it was critical. No, Your Honor. Well, as set forth in the opposition to Mr. Lewis's demur to that second criminal complaint, it did not foreclose the ability of refiling the charges. Well, I can refile the charges, but how can they refile the charges with a statement different from what she had said under oath emphatically was said? Because that was different than what she recorded initially. Which was not under oath, but this was under oath. Correct, Your Honor. And I think that the theory was she would be given the opportunity to refresh her recollection with her contemporaneous statement and testify again. All right. At least unusual. It is a very unusual case, Your Honor. Very unusual. But anyway, thank you. Thank you very much, Your Honor. Counsel, I'll give you a couple minutes if you have something you want to respond to. In terms of the sequence of events, I think it's clear from the testimony that they based the charge on what Ms. Diaz said, right, and that there wasn't anything in the interview with Mr. Lewis a couple of days later that was relevant to getting the arrest warrant or anything. So in terms of law enforcement objective or why they had to increase the pressure or do the things they did, they had enough to get the arrest warrant. They were proceeding based on what their witness was saying. Now, our position is she lied about it and that she basically took the erroneous information from a prior flag and did that. That's a dispute of fact. Our client says he didn't say those things. Yeah, and she may not have lied. She may have just sort of unconsciously. Well, I mean, that's an issue, right, in terms of that would need to be disputed. But certainly our client has been very consistent, was consistent in the interview, was consistent afterwards that he never said that. I'd say it was a little vague at times. What's that? It was a little vague at times. Well, I mean, that may be, but he's clear about the fact that he never said that he was going to get a gun and shoot people, that that wasn't. He was aggravated by the fact that people kept hanging up on him in the pharmacy, that he, like many other vets, have a hard time getting their drugs. He needed his PTSD meds because he's 100% disabled, and the symptoms are very bad when he doesn't have his drugs. So he was trying to do that. In fact, he thought Ms. Dia was his godsend. She actually arranged to get him the PTSD drugs at the end of that conversation and asked him to come in the next day to the pharmacy where he picked them up without any officers surrounding him or any concern at all. He got the drugs. So they come to his house, and, in fact, he did tell them to stop. He teared up. He's confronted by these two guys, one of whom is running around lunging at him, threatening him, calling him a baby killer, questioning his sexuality. That's not, it seems to us at least, and based on the case law that we've cited, that officers can cross the line to extreme and outrageous behavior. This is not an ordinary law enforcement case. We're not talking about the fact that when people are arrested, sometimes that causes distress. Of course it causes distress. Police-citizen interactions often cause stress, and we're not talking about that kind of case. It's not ordinary behavior to threaten to take people out and beat them. It's not ordinary behavior to call a Vietnam vet a baby killer and all the other things that he called and lunge at him and physically threaten him and then come back and threaten to shoot him if he doesn't open the door quickly enough. And the second time around, why go through what they went through in terms of getting, even when they got the arrest warrant, using the same arguments that had just been rejected by a Superior Court judge and adding a witness intimidation charge that they were told in advance was bogus to increase his bail so that he would stay in jail over a holiday weekend. They could have arrested him the next day. Could you clarify about, I mean, you have this document in the record from a DA who basically said this was a bad charge. So why did it go forward? I didn't understand that part. Well, the thing is, it didn't go forward, right? He never agreed to it. At what point was that document? Was it before or after they got the arrest warrant? It's after the second one, I believe. After the second. Because it's dealing with the second set of charges. After the second arrest. That's right. That's right. And he was told, Mossberg was told, the witness intimidation charges, there's no witness intimidation. But the DA did file them. No, the DA didn't file witness intimidation. Mossberg's got it for the arrest warrant, but the DA didn't file it. But he filed the other one, even though this DA who wrote the memo. They did refile the other one, but the supervisor in the office said, that's not a good charge, why are you doing that? And all that Mr. Lewis did after the second charge was live his life. That's all he did. I mean, he didn't do anything else. He was already going to counseling. He sees a psychiatrist at the VA. He didn't do anything different. He didn't have a separate counseling. He had never had criminal charges against him before, right? So he just lived his life. And then six months later, they dismissed the case. From our standpoint, there's a question of fact as to whether that's a favorable termination. But they didn't just out of the blue dismiss the charges while Mr. Lewis lived his life for six months. There was an agreement. And when they came in on the record, they informed the judge there was an agreement and this is what it's going to be. Well, certainly it appears that his attorney and the DA discussed that. It is not clear that Mr. Lewis was even in court. But that I'm not 100 percent sure about. I don't believe he was asked whether he wanted to be part of this agreement. His position is, I didn't do anything wrong and I want my name cleared. That was his position from the beginning to the end. I did not do what they said I did. All right, counsel, you're well over your time. Thank you very much. We're going to submit Lewis v. Mossbrook and we're going to take a five-minute recess.
judges: Wardlaw, Berzon, Bade